The fourth case is off the calendar for argument because of weather. When we move to the fifth case this morning, Firestone Financial v. Meyer. May it please the Court. My name is John Meyer. I'm appearing before you pro se. I'm appealing the decision of the District Court which granted summary judgment on my counterclaim of promissory estoppel. I'm also appealing the decision of the District Court that the sale of the assets by Firestone was commercially reasonable under the Uniform Commercial Code. With respect to the summary judgment motion grant on my counterclaim of promissory estoppel, the lower court, the District Court, said that my reliance on commitments by Mr. Dan McAllister, a vice president of Firestone, was unreasonable. That the agreement that funding would be made on prior loans on the same basis as prior loans lacked agreement on certain essential terms and that the damages were speculative or vague. With respect to my reliance on the commitment of Dan McAllister, I believe that my reliance was reasonable given the history and communications and commitments that were made over a period of time and all of those commitments were honored by Firestone, all of them that were made by Dan McAllister. The business that the loans applied to was called Route Laundry Business. That's where laundry machines are placed in apartment buildings. The apartment building owners pick up the space expense and the utility expense and our side picked up the cost of the machines and the repair and maintenance of the machines. The revenues from those machines were split. Firestone was first approached by a broker that I retained in April of 2012 to fund about $45,000 worth of machines that I placed on route through JHM Equipment Leasing. Firestone, over the next couple of months, did an extensive review of financials, came back to me with numerous questions, wanted to know the operations, the customer, all the aspects of the business. And then in June, Dan McAllister, the vice president of development for Firestone, came to visit me, went through much of the same information, visited my facilities, my three businesses, asked questions as to where we were going. And at the end of that conversation said when he got back to the office, he would make sure that that loan was funded. That's exactly what happened. We continued to proceed. Firestone, through Dan McAllister, had numerous meetings with me, was in communication frequently with respect to what we were doing, how much machinery was going to be needed for a customer, a primary customer of JHM Equipment Leasing. And in November, I told him I would be submitting the second loan based on the equipment that we had discussed and had been purchased. He told me I should submit the loan, that that loan would be funded promptly, and it was. Later in November, I met with Mr. McAllister because I wanted to curtail the purchases by JHM Equipment Leasing. I wanted to curtail them because one of the businesses, the commercial laundry business, had built a new facility, and the excess cash flow that was being used from that business to purchase equipment for JHM Equipment Leasing was going to be tied up with the expansion of that business and the construction costs. Mr. McAllister said that he would set up a line of credit to eliminate the problem of financing equipment in the future, but in the interim, before he could set up the line of credit, which he anticipated doing in early 2013, that Firestone would honor and would fund equipment purchased for the business of JHM, the route equipment business. He then confirmed that with an email. We proceeded to have the same discussions that we had before. In early January, he told me that he would be delayed in setting up the line of credit because he was working on a different lending program for Firestone, and it was taking more of his time to set that up. I submitted another funding application in February in accordance with his direction. That one was for as much as the first two loans. There was no problem. Firestone funded that, executed documents in accordance with the same type of documents that were used the first two times, all the way through every commitment that Mr. McAllister had made was honored. Then we get to the point in April where he leaves Firestone, and all of a sudden I'm dealing with the president of Firestone. In a meeting in June, the president of Firestone said that the funding application that I had submitted in April,  he then said he would, after meeting with me and reviewing the facilities, he said he would honor one of them. He was aware of what the consequences would be of not funding, that I wouldn't be able to pay Maytag, which was the provider of the equipment, and the company that had the distribution rights with Maytag would lose those rights and the consequences that would follow. Counsel, I have a jurisdictional question to ask you. I've just been looking through your materials. Did the district court, you have the order, the memorandum of opinion and order in here. Was there a judgment entered? Because I don't see that in your materials, a judgment actually allotting money, or did you just have the order to Firestone? I believe that there was an order, the memorandum of opinion and order. It was more like a minute order in the memorandum of opinion. It was the detail of what the court. So the order is all you have submitting before us? I'm sorry, I didn't hear. There was not a judgment following, is my question. I don't recall, Your Honor. With respect to the reasonableness of the equipment that was sold, whether it was commercially reasonable, the equipment placed on route has its highest value by generating money in the apartment buildings that it's placed in. Firestone, after it took possession of the equipment, told me I could not repair the equipment anymore, that they would repair the equipment. At first it was going to be sold as a route, and then the owner of the apartment buildings, Pangea, said that it could not be sold as a route because Firestone had failed to maintain the equipment, had failed to repair the equipment, and therefore it didn't want Firestone to sell it as a route anymore. I have reserved time for rebuttal, so I believe I'm at that time. Thank you, counsel. Mr. Woolley? May it please the court, Randall Woolley for the appellee, Firestone Financial. Mr. Woolley, let me ask you initially, are we to look at the Illinois law or Massachusetts law? I think you both agree that Massachusetts law governs now? We have, Your Honor, yes. In our prior opinion, it was Illinois law. When we came back from the first appeal, we filed a motion to dismiss, and the appellant agreed that Massachusetts law should apply to the counterclaim, and I think from that point going forward we've essentially applied Massachusetts law, but I think the result would be the same under Illinois or Massachusetts law. Just to give a brief summary, this case is about a lender, Firestone, that made four loans and then elected not to make a fifth loan, and as a result of that credit decision, the appellant contends that Firestone breached an oral promise, which caused him to default on his underlying loan obligations to Firestone. Additionally, he contends that that breach gives rise to a counterclaim for promissory estoppel. We were asking that this court affirm the district court's decision to award Firestone's summary judgment on its breach of contract action and on the appellant's counterclaim for promissory estoppel, and there was a separate two-page judgment order that was entered in the district court in addition to the memorandum of opinion, and with respect to Firestone's breach of contract action, the appellant essentially agrees that the four loans were entered, and he agrees that he didn't make the payments as required, but he claims his failure was the result of Firestone's breach, and so for that reason the focus of our argument and the focus of my presentation today is with respect to the counterclaim for promissory estoppel. In the appellant's briefing, his first issue on appeal is whether the district court erred in dismissing his counterclaim, and that's not an accurate statement of what happened in the district court. The district court did not dismiss the counterclaim. The district court determined that Firestone was entitled to summary judgment, and so even in his briefing before this court, he seems to be focused on this Rule 12 argument that he met all the pleading requirements, but the real question was to be addressed under Rule 56, and it was whether the appellant raised any genuine issues or raised genuine issues of material fact, and it's our position that the district court correctly concluded that he did not. With respect to the promissory estoppel claim, Mr. Meyer had raised genuine issues of fact with respect to each of the four elements, and he could not raise a genuine issue with respect to any of the four. Starting with the question of whether there was an unambiguous promise, Mr. Meyer contends that Dan McAllister told him that Firestone would approve any and all loan requests on a going-forward basis. Dan McAllister was deposed in this case. He denied promising Mr. Meyer that Firestone would make these loans. He denied telling Mr. Meyer that he was involved in the credit department or had any underwriting authority. Mr. Meyer did not refute that testimony, and additionally Mr. Meyer, in his briefing and today, acknowledged that he understood that Firestone had a credit review process, that he was contacted by people from Firestone to ask questions about his loan request. He had to submit documents to Firestone. He had to submit vendor invoices, and Firestone did not fund any loans until it received a signed contract. But despite this history, he contends that Firestone changed its normal process and entered into an oral promise, and additionally the oral promise seemed to evolve throughout the course of the litigation. Initially he claimed that Firestone promised a $500,000 line of credit, and then later it became this idea that Firestone agreed to fund this specific loan package. So the fact that the alleged unambiguous promise changed implies that it wasn't such an unambiguous promise. Additionally, Mr. Meyer contends that he was told by Dan McAllister that Firestone would fund the loan requests, and as this court determined in Classic Cheesecake, there is a distinct difference between telling someone the loan would be approved and telling someone the loan had been approved. So this court should apply its own ruling in Classic Cheesecake and determine that the district court correctly determined that there was no unambiguous promise. Turning to the next element of whether the reliance was reasonable, the reliance was not reasonable because none of the essential terms of the loan had been discussed. There's no discussion regarding the loan amount, the repayment term, the interest rate. So absent these essential terms, there's no reason to believe that there's a binding agreement. Additionally, as I mentioned, Mr. Meyer understood from the first three loans that Firestone required a written loan document, required a credit review, required invoices from the vendor. So it was unreasonable for Mr. Meyer to conclude that Firestone had changed its course of dealing and somehow agreed to waive its credit review process. Moreover, it's common practice in the lending industry to have sort of on the front end a salesperson that develops the relationship with the customer and then on the back end have the credit department that reviews the credit worthiness of the loan request. And Mr. Meyer knew this. He knew this from his years in the laundry business. As he mentioned, he operated three different entities, J.H.M., Dolphin, and Meyer. Dolphin and Meyer had already pledged all their assets to other lenders, including Eastern Funding, at the time that Firestone came into the picture. He knew from his prior years as an attorney prior to being disbarred. I believe he was a business lawyer. So he has an understanding of contracts and of the lending practices. So given this background, it was unreasonable for him to conclude that Firestone was going to change how it operated to make these loans on his behalf. Turning to the next element of foreseeability, again, Firestone only directly contracted with J.H.M., yet the appellant is contending that losses were suffered by all three entities, J.H.M., Dolphin, and Meyer Enterprises. And additionally, he is contending that because Firestone declined to make a $30,000 loan, that there was millions and millions of dollars in lost profits suffered by each entity, and it simply wasn't foreseeable to Firestone that those types of damages would occur from a $30,000 loan package. And it wasn't foreseeable to Firestone that Mr. Meyer had no other lending options. Additionally, the main source of the loss was this fact that Maytag allegedly placed Dolphin on a credit hold, and there was no evidence in the record of a relationship with Maytag. There was no evidence that Maytag actually placed Dolphin on a credit hold. So in the absence of any evidence, the court could not determine that that loss was a result of Firestone's conduct. Additionally, I want to focus on this Maytag issue a little bit further. What he is essentially contending is that because Firestone orally promised a loan to J.H.M., his other entity, Dolphin, a vendor of laundry equipment, essentially transferred that equipment to J.H.M. without any payment, without any contract, without any consideration. In a normal situation, that just wouldn't happen. A vendor wouldn't give away its collateral. But it only happened here because Dolphin and J.H.M. are both owned by John Meyer, and Mr. Meyer could not prove that that was foreseeable to Firestone. With respect to the damages that are alleged in this case, the damages could not be established with sufficient certainty. There was nothing in the record regarding the business performance of these three entities. He's alleging lost profits, and those are very difficult to prove without any financial statements. And the fact is none of the three entities filed tax returns in 2012 or 2013. There were no financial statements made available during the course of the litigation. To the extent there were financial statements created for the companies while they operated, they were apparently lost because of an e-mail account being closed or because of an eviction proceeding. Moreover, the only evidence offered was Mr. Meyer's own affidavit, and the affidavit included information that was too hypothetical and too remote and speculative to be reliable. He essentially contends without any foundation, any evidence, that the laundry machines would have lasted 10 years, that he would have necessarily generated $250,000 in revenue from use of those machines, and the only $250,000 seemed to be pulled out of thin air. That number was equal to the amount that Firestone financed, and there's simply no correlation between the amount to be financed and the amount that could be expected to be generated as revenue. The calculations also didn't account for operating expenses or taxes or depreciation or other items. And then just turning briefly to his defense regarding the sale of the business, Firestone did not have any – Firestone only had a security interest in the collateral. The sale included – he's alleged that Firestone should have done more to sell the route business, but Firestone – the route business consisted of the laundry machines and the service contract with Pangea, and Firestone didn't have any basis for compelling Pangea to continue with the service contract and therefore just had to sell the laundry machines to third parties. I see that I'm out of time. I'll simply conclude by asking that you affirm the decision of the district court to grant summary judgment to Firestone on behalf of – on the breach of contract action as well as the counterclaim for promissory estoppel. Thank you. Thank you, Counsel. Mr. Meyer, how much time? You have two and a half minutes. Let me address several of the things that Counsel for Firestone has brought up. First, with respect to the collateral, he claims that Firestone didn't have the ability to sell the route agreement. Firestone had the only security interest in the assets of JHM Equipment Leasing. Firestone's security interest was a blanket security interest. It covered all assets. The assets of JHM Equipment Leasing included the route agreement with Pangea, so it had every right to sell the equipment with that route agreement. Next, he said that the $250,000 was pulled out of the air with respect to revenues of JHM Equipment, but if you look at the evidence and the affidavits that were submitted, the loans that were generated with Firestone were being paid on a current basis, and there was positive cash flow. So from that, we know that the loans would have been paid if the operations had been able to continue, and that's what gives rise to the revenues that were anticipated and could have been anticipated. He said that the obligation or commitment was that the loan would be funded in the future, not that it's already been approved. The reason that the loans couldn't already be approved was that they were dependent on the amount of equipment that was being purchased, and Firestone and Dan McAllister were part of the communications. They knew what equipment was being purchased or going to be purchased for the route, and the amount of equipment determined the value of the funding to be submitted and provided by Firestone. So he said that the other aspects that were vague based on the first two loans were the amount of interest, and yes, there was a slight difference in the amount of interest in the first two loans between the first and the second, but the third loan was based on the same interest rate as the second loan, so apparently Firestone had no problem with that as being confusing because it generated the third loan, which was based on the commitment of Dan McAllister. I see my time is up. Thank you very much. Thank you, Mr. Marks. I'd ask that the decision of the district court be reversed. Thanks to both counsel. Case is taken under advisement.